**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 17-CV-80619-WPD**

FEDERAL TRADE COMMISSION,

    Plaintiff,

v.

STRATEGIC STUDENT SOLUTIONS LLC, a limited liability company, STRATEGIC CREDIT SOLUTIONS LLC, a limited liability company, STRATEGIC DEBT SOLUTIONS LLC, a limited liability company, STRATEGIC DOC PREP SOLUTIONS LLC, a limited liability company, STUDENT RELIEF CENTER LLC, a limited liability company, CREDIT RELIEF CENTER LLC, a limited liability company, and
DAVE GREEN, individually and as an officer of STRATEGIC STUDENT SOLUTIONS LLC, STRATEGIC CREDIT SOLUTIONS LLC, STRATEGIC DEBT SOLUTIONS LLC, STRATEGIC DOC PREP SOLUTIONS LLC, STUDENT RELIEF CENTER LLC, and CREDIT RELIEF CENTER LLC,

    Defendants, and

DG INVESTMENT PROPERTIES LLC,

    Relief Defendant.
_____/

## RECEIVER'S FIRST STATUS REPORT TO COURT AND FIRST APPLICATION FOR RECEIVER'S FEES AND ATTORNEYS FEES THROUGH JULY 21, 2017

    Charles H. Lichtman, the Court's appointed Receiver ("Receiver"), through his undersigned counsel, hereby submits his First Status Report and First Application for Receiver's Fees, and Attorneys' Fees to the Court to cover all relevant aspects and fees of this receivership from the inception of the Receiver's appointment on May 15, 2017 through July 21, 2017, and states:

1

**I.      INTRODUCTION.**

This Court appointed the Receiver after granting the request of the Federal Trade Commission ("FTC") in its underlying consumer protection enforcement action brought against six defendant corporate entities doing business in their own name, in addition to one individual defendant and one relief defendant.

Since his appointment, the Receiver and his team of professionals have been working efficiently to effect this Court's *Ex Parte Temporary Restraining Order with Asset Freeze, Appointment of a Temporary Receiver, and Other Equitable Relief, and Order to Show Cause Why a Preliminary Injunction Should Not Issue,* which was subsequently converted to a *Stipulated Preliminary Injunction* on May 26, 2017 (the "TRO"). This work has principally involved the Receiver and his counsel securing business records and investigating the various businesses and assets of the entities owned and controlled by defendant Dave Green ("Green"). It is clear to the Receiver that Green used his entities for three purposes: (i) as vehicles to run the illegal enterprise which the FTC has alleged was a student debt relief scam against unsuspecting and innocent consumers; (ii) as means to launder the proceeds of that scam by investing in real estate properties, now under the Receiver's control; (iii) to enrich himself and his family members.

The Receiver has been acutely focused on maintaining the value of all assets. Indeed, almost immediately after the Receiver's appointment he investigated and confirmed that approximately $452,000 was transferred by Green <u>after</u> he had been served with the TRO. In addition to investigating those transfers, the Receiver investigated the status of Green's alleged homestead claims. Based upon his investigation, the Receiver and his counsel negotiated a first lien on Green's alleged homestead, thereby securing nearly $600,000 of value in real property

that can be liquidated for the benefit of the Receivership estate.

Factually, despite the TRO restraining the Defendants from transferring assets, on May 18, 2017, the day after the TRO immediate access was effected, Green caused (i) a $250,000 wire transfer from an account that he controlled at Applied Bank, to a BB&T branch in Hollywood, Florida, for the account of another company, A&D Mortgage LLC, a Florida LLC based in Hollywood, Florida.  The transfer, in clear violation of the TRO, left $1000 in the Applied Bank account and is believed to have been used to pay down Green's mortgage on his Delray Beach residence, and (ii) on May 22, 2017, Green wired $202,679.15 from First Global Bank Limited in Kingston, Jamaica, out of the bank account of DG Call Sales Solutions, Ltd. (a Green controlled account). This second wire transfer was also sent for the benefit of A&D Mortgage LLC, and is believed by the Receiver to have been used to pay down the mortgage on Green's residence.  These two wire transfers, which clearly violated the TRO, caused the Receiver to file a Motion for Order to Show Cause against Dave Green, which ultimately resulted in the entry of the aforementioned Agreed Order.  In addition to the first priority lien, the Agreed Order granted to the Receiver full control over 22 rental properties under the control of Green and/or trusts created by Green.

Additionally, the Receiver took custody of and secured the Defendants' offices and all of their books and records, including all electronically stored information ("ESI"). This included changing the locks on the doors and physically moving and copying key documents. Notwithstanding, the Receiver feels compelled to advise the Court that recently, someone broke into the former Defendant's business offices by breaking the door, and only rifling through all of the business records still locked at the premises.  An investigation is ongoing.

Throughout this process, the Receiver has worked cooperatively with the FTC on all

appropriate matters, with each side being mindful and respectful of the other party's legal position in this case and attendant responsibilities and duties. The success of the appropriate coordination between the Receiver, his counsel, and the FTC is self-evident in the results obtained already at this point in the case. In total, 46 corporate bank accounts which contained approximately $2.1 million in funds have been frozen and some of the funds have been placed in the control of the Receiver.

The Receiver necessarily has had to simultaneously address a sudden flurry of issues pertaining to landlords, vendors and consumers. This has included problem solving for various tenants, who through no fault of their own, have had various issues resulting from the poor manner in which Green managed properties under lease to these tenants.

The Receiver has also already turned his attention from stabilizing and collecting hard assets, and preventing waste and dissipation, to investigating potential claims, and understanding the magnitude and size of the potential victim/claimant pool. This endeavor is considered work product, but put simply, involves tracing of funds and determining who received fraudulent transfers. This will lead to some recovery based litigation, which the Receiver will manage efficiently.

In compliance with the Duties and Authority of the Receiver outlined in Section XXII. of the TRO, based on the currently known information discovered by the Receiver, the Receiver reports to this Court his findings and facts.

## II.     STEPS TAKEN IN EXECUTION OF THE TRO.

On May 17, 2017, consistent with the TRO, the Receiver seized control of the two main offices utilized by the defendants in Boca Raton, and two additional virtual offices located in Ft. Lauderdale and Lake Worth. Additionally, the Receiver employed other ancillary measures to

secure receivership property (the "Immediate Access Process"). Notwithstanding the complexity of multiple locations, the Receiver is pleased to advise the Court that the Immediate Access Process proceeded smoothly, with Berger Singerman acting as Receiver's counsel working cooperatively with the FTC to ensure that there was no duplication of efforts. For example, both the FTC and the Receiver appropriately had forensic computer specialists present during the Immediate Access Process to duplicate ESI on the scene, and to take custody of certain computer discs, hard drives and other printed materials. However, rather than having each computer duplicated by both the FTC and the Receiver, the process was divided so that each drive was duplicated by a single expert and then the copy shared with both the Receiver and the FTC. This reduced the amount of expert time needed and increased the amount of data securely collected.

The FTC and Receiver have retrieved approximately 603,970 documents and emails, which are now consolidated into a document management system, housed in the Receiver's office. This allows the Receiver and his team to easily locate pertinent documents pertaining to the inner workings and financial condition of the Receivership Defendants. From experience, the Receiver has learned that e-mails are critical to investigations and proving claims in litigation.

In terms of paper documents, approximately 7 boxes of documents were removed by the Receiver from the premises during the Immediate Access Process, and some of those documents were scanned and disseminated to the FTC. Similarly, the Receiver, who technically now controls all of the Defendants' business documents is receiving and copying critical documents as they are found, and providing copies to the FTC upon request. The Receiver has caused the locks to be changed at both suites, in an attempt to assure security. However, two weeks ago, as mentioned above, the Receiver discovered that someone brazenly broke into Suite 495 by

kicking in the door and breaking the door frame and deadlock. The contents of what was taken is not clear right now since it appears what the thieves were looking for were hard documents and files. Notably, personal property such as electronics were not taken, and file cabinets appeared to be the only item disturbed, as most were found open. The Receiver is currently working to retrieve the security video footage from the property manager in control of the video, to identify any suspects.

A sizable amount of consumer files and other business documents remain located at Suite 495. Initially securing and maintaining Suite 495 was the most cost effective way to preserve these records. However, in light of the break in, the Receiver will be moving all documents from both suites to a smaller facility where they can be maintained as a repository during the disposition of this case. Such action could result in a material savings of rent, compared to the suites that the defendants currently occupy. Reducing this cost while keeping these documents secure is a high priority of the Receiver, and he hopes to have this accomplished in 30 to 60 days.

The Immediate Access Process of the Boca Raton, Ft. Lauderdale and Lake Worth offices was intentionally timed to occur simultaneously at 10:00 a.m. sharp on May 17, 2017. To assure consistency that the correct message was delivered to the employees of the defendants, literally upon entry of the premises when the Immediate Access Process began at the Boca Raton location, the Receiver read from a prepared written script describing all relevant information about why the Immediate Access Process was occurring and what the employees were to do.

Further, to preserve evidence, protect computers and outgoing communications and assure a consistent appropriate message was delivered to the outside world, principally being to consumers, the Defendants' various websites were preserved, but immediately shut down, with

access to the websites locked out to all but the Receiver. However, the Receiver promptly started the creation of a new receivership website that is used to disseminate information to the public about all relevant matters pertaining to the receivership, including the posting of appropriate pleadings and other notices. The website is found at: www.SRCReceivership.com and is updated as new information relevant to consumers becomes available. In conjunction with the Receiver's website, a unique e-mail address has been created to field direct inquiries from consumers and employees:

      Receiver's E-mail:     SRC@bergersingerman.com.

The Receiver is also working on a methodology to migrate direct communications from the previous Defendants' website to the receivership website, so as many consumers as possible can receive electronic notice that the defendants' businesses have been shut down. This is probably the most cost-effective and time-efficient way to handle communications given that upon information and belief, there are over 20,000 consumer victims of this alleged student loan services scam located in various states. Ultimately, the Receiver hopes to migrate a list of affected consumers onto his website, so that when service of papers or announcements of any significant nature must be disseminated to the consumer victims, it can be done by a "blast e-mail" to everyone at once. The Receiver intends to file a formal motion seeking this means of service because utilizing e-mail for service will save tremendous man-hour time, Xerox and postage expense. The Receiver points out that presently he doesn't even know who all the affected consumers are, or how to contact them, but has made assembling this data a high priority.

All told, the FTC and Receiver cooperatively worked together to assure duplication of ESI from the Boca Raton location: cloud computing services, back-up hard drives, office servers,

desktop computers, a laptop computer, Xerox machine hard drives, telephone voicemail, and cell phones.

At the Immediate Access Process, the Receiver also prepared and disseminated a questionnaire to all employees who were located at the Boca Raton business premises. This form, allowed for under the TRO, was used to obtain contact information for future fact-based interviews and investigation, as well as to assure appropriate personal information was obtained from employees so that tax, insurance and related issues could be dealt with correctly.

Finally, from an administrative standpoint, (i) the Receiver has caused all mail to be forwarded to his attention from the United States Postal Service, (ii) he has obtained and filed with the Court his Receiver's Bond, and (iii) he has opened a Receivership bank account at TotalBank.

### III.   NEXT STEPS – VALUATIONS OF ASSETS AND LIABILITIES.

The Receiver continues to work with his attorneys to determine the value of all liquidated and unliquidated assets of the Receivership Defendants. Pursuant to the TRO, approximately $2 million of money from various bank accounts has been frozen and most of it already turned over to the Receiver. The Receiver is in the process of transferring that money to his receivership bank account, so that it can be used to immediately pay critical expenses, and **subject to direction and approval from the Court and the FTC** to potentially compensate victims and creditors. In the performance of the duties assigned by the Court, the Receiver, and his attorneys are accruing their fees and expenses for submittal to the Court for approval which are outlined below in section XII.

The Receiver also uses the Receivership funds to pay the landlords, critical vendors and any costs associated with the rental properties turned over to the Receiver, to protect receivership property and to move the receivership forward.

First and foremost, however, rent is due at the two suites in the Boca Raton location. The Receiver has recently received copies of the respective office leases in order to determine those premises contractual status. The Receiver is working on the assumption that since July 1st has passed, rent is due. The Receiver does not wish to be in default on any office lease, although it is his clear intention to terminate the leases as quickly as possible, and to thereafter, as provided above, (i) move all documents to smaller, less expensive space; (ii) liquidate all personalty (such as desks and computers) contained therein as cost effectively as possible, which the Receiver has already retained an auction specialist to obtain a quote; and (iii) terminate equipment leases such as for Xerox machines, forthwith.

The Receiver has now taken possession of and is responsible for managing the 22 rental properties previously owned by Green or one of his entities. This is a large undertaking with many families relying on the Receiver and his management team to continue to run the day-to-day operations of the properties. The Receiver takes this endeavor seriously, and thus, has hired Keyes Property Management to handle the management of all the properties. The Receiver is investigating the quickest and most efficient way to sell these properties in an effort to maximize the assets of the receivership estate.

## IV. FUTURE STEPS – INVESTIGATIONS AND LITIGATIONS.

The Receiver is also investigating the number of affected consumers and the size of their respective claims. This investigation includes how many consumers did business with the Defendants, the amount of their loss, individually and collectively, and potential litigation

9

targets. This investigation is necessary because to the Receiver's surprise, there is no comprehensive database within the Defendants' ESI that identifies all consumers with whom the Defendants did business with.

As the Court can gather from this report, the volume of documents and ESI to be reviewed is very substantial. The Receiver is mindful that professional expense related to an investigation this significant, while obviously essential to the success of the receivership, must be handled carefully so as to not lose sight of the cost-benefit analysis of spending money in relation to potential recoveries for the benefit of consumer victims.

The Receiver has begun his review of the Defendants' payables journal to determine who received money from Defendants' numerous bank accounts. This work helps establish who is complicit in activity that harmed consumers, so that all investigatory matters together will enable the Receiver to prepare an appropriate litigation analysis. To that end, the Receiver has already identified numerous targets that will be subject them to pre-suit demand, and then potentially, litigation. For obvious reasons including privilege and work product, the Receiver has not listed the names of these targets. However, the Receiver stands ready to provide any information about his investigation to the Court, either under seal, or in camera.

## V.     RECEIVER'S ASSESSMENT OF THE BUSINESS.

After initial evaluation of the books and records identified during the Immediate Access Process as well as the correspondences and phone calls from consumers, the Receiver finds it virtually impossible that Defendants' business can operate in compliance with the TRO. The Defendants' records are in shambles being incomplete and not in compliance with law, insofar as the FTC's Complaint and Motion for TRO are concerned. Moreover, the financial state of the Defendants' records is worse. Funds were commingled hopelessly among various accounts, all

of which were controlled by Green, and there is no general ledger. The funds were also used as Green's own "cookie jar" for personal and family expenses.

Thus, the Receiver believes that the assets and property of the Defendants' business should be liquidated and marshaled in an efficient manner to return funds to consumers, to the extent funds are available to do so, and that such is directed by the FTC and this Court.

## VI.     OTHER MATTERS FOR THE COURT.

Pursuant to the TRO, the Receiver continues to investigate the business practices of the defendants and reserves the right to file additional information with the Court under seal as warranted.

## VII.    RECEIVER'S FEES AND BERGER SINGERMAN LLP ATTORNEYS FEES

The Receiver hereby submits this first application for payment of (i) his professional fees as Receiver, (ii) legal fees incurred by his attorneys at Berger Singerman LLP, all to cover the time period from May 15, 2017 through July 21, 2017.

The Receiver points the Court to sections I-VI listed above to fully advise the Court of the wide range of work performed by the Receiver and his professionals in just the first 67 days of the receivership. Sections I-VI detail and provide extensive explanatory support for the range, scope and varying complexity of the day to day issues the Receiver has dealt with.

With the foregoing background, the Receiver submits his and Berger Singerman's fee application together, which seeks a total professional fee award of $166,188.50 representing 459.20 hours performed by the Receiver, and his attorneys and paralegals. In conjunction with time keeping for services performed, the Receiver is submitting under seal a detailed statement itemizing all time entries by those professionals employed at Berger Singerman. The itemized statement is filed under seal because it contains work product that should not be divulged to the

public, or more particularly, to the Defendants and other potential target defendants. The Court will see the very substantial work performed to date by the Receiver and his attorneys with virtually no duplicate billing.

The Receiver points out that all time entries in this fee request are broken down into 1/10 of an hour billing increments. Further, as the Receiver reviewed his and the Berger Singerman's timesheets and pre-bills, he voluntarily wrote down and is not seeking payment for approximately $15,000.00 in services rendered and which were legitimately performed and billed. The Receiver has also reduced his standard hourly rate for this matter from $695.00 to $495.00, in an effort to keep fees down.

The Receiver is very mindful that this is an extremely significant fee request, and thus, he reiterates the relevance of the review of sections I-VI listed above, combined with the size and scope of this receivership. Because of the significance of this fee application, the Receiver advises that in order to mobilize and orchestrate the multi-office Immediate Access Process, it was necessary to immediately involve six Berger Singerman attorneys (plus the Receiver), and one paralegal to step in with one day's notice to prepare for, effect and then subsequently sort out the Immediate Access Process, which started early in the morning on May 17, 2017, and went until the early evening hours. The FTC was completely aware of this effort and has indicated that the Receiver and his team did an excellent job in helping to effect the Immediate Access Process, along with all follow up work, much of which is described herein.

Once the Immediate Access Process was completed, all but two attorneys and one paralegal were immediately released from handling other matters in the case. However, significant work had to be accomplished quickly and immediately thereafter, to start assembling and reviewing as much of the massive volume of ESI seized as possible, in order to prepare for

an expected full evidentiary hearing on converting the Court's Temporary Restraining Order to a Preliminary Injunction. This hearing was held on May 26, 2017 and literally, not until the hearing began, as the Court saw, did the defendants stipulate to the Preliminary Injunction.

Thus, by the time of the Preliminary Injunction hearing and in the first critical 11 days of the receivership, approximately $87,059.50 or 52% of the fees charged had been expended on a very material, time-sensitive, complex undertaking, that in fairness to the Receiver, was effected flawlessly. The Receiver also believes that other comparably sized law firms would have incurred an even larger bill to get the case this far, this fast. The Receiver also points out that his and the other Berger Singerman hourly rates have been uniformly approved in legal work performed in this district, including the Receiver's work as lead litigation counsel to the Chapter 11 Trustee, Herbert Stettin, in the Rothstein Rosenfeldt Adler bankruptcy, and in another proceeding where he served as Receiver for the FTC before Judge Scola.

This case is still very large in scope, with much work to do, however, the Receiver again points out that there are now only two attorneys and one paralegal at Berger Singerman assisting the Receiver. To be sure, the paralegal assigned to the file is handling the bulk of the administrative matters in order to demonstrate the Receiver's recognition of keeping down costs as much as possible.

The Receiver also requests an award of costs expended by himself and his attorneys at Berger Singerman in the amount of $2,333.67. A copy of a compilation breakdown of costs is attached as Exhibit A hereto, and is also included within the Berger Singerman detailed attorney fee statement. The Receiver points out to the Court that none of the costs advanced are profit centers for Berger Singerman, including "Reproduction" (xerox) costs. Therefore, the Receiver

and Berger Singerman request this Court grant a fee award of $166,188.50, plus costs of $2,333.67 for a total award of $168,522.17.

**WHEREFORE**, (i) Charles H. Lichtman, Esq., the Receiver and Berger Singerman LLP, his attorneys request that the Court grant the Receiver and Berger Singerman a fee award of $166,188.50, plus costs of $2,333.67 for a total award of $168,522.17; (ii) The Receiver asks this Court to grant all such other relief as it deems just and appropriate.

### LOCAL RULE 7.1 CERTIFICATION OF COUNSEL

The exhibits to the Receiver's First Status Report to Court and First Application for Receiver's Fees and Attorney's Fees Through July 21, 2017 are filed under seal given the confidential nature of the time entries which can reveal litigation strategy. The Receiver's counsel has conferred, via e-mail, with counsel for the FTC and Defendants prior to filing the Receiver's First Status Report to Court and First Application for Receiver's Fees and Attorney's Fees. The FTC and Defendants have not yet reached a position on this fee application and may submit their position in a future filing with the Court.

        **BERGER SINGERMAN LLP**
        Counsel for Charles H. Lichtman, Receiver
        350 East Las Olas Boulevard, Suite 1000
        Fort Lauderdale, Florida 333014
        Telephone: (954) 525-9900

        By:*/s/ Isaac Marcushamer*
        Gavin C. Gaukroger, Esq.
        Florida Bar No. 0076489
        ggaukroger@bergersingerman.com
        Isaac Marcushamer, Esq.
        Florida Bar No. 60373
        imarcushamer@bergersingerman.com
        drt@bergersingerman.com

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via the Court's CM/ECF system on all parties on the attached Service List this 25th day of July, 2017.

By: */s/ Isaac M. Marcushamer*_____
Isaac M. Marcushamer, Esq.

## SERVICE LIST

Miya Tandon, Esq.
mtandon@ftc.gov
Adam M. Wesolowski, Esq.
awesolowski@ftc.gov
Nikhil Singhvi, Esq.
nsinghvi@ftc.gov
**FEDERAL TRADE COMMISSION**
600 Pennsylvania Ave., NW, CC-10232
Washington, DC 20580
(202) 326-2351 (Tandon)
(202) 326-3068 (Wesolowski)
(202) 326-3480 (Singhvi)

Jeffrey A. Backman, Esq.
Jeffrey.backman@gmlaw.com
Richard W. Epstein, Esq.
Richard.epstein@gmlaw.com
**GREENSPOON MARDER, P.A.**
200 E. Broward Blvd.
Suite 1500
Ft. Lauderdale, FL 33301
Tel: (954) 491-1120
Facsimile: (954) 343-6958

7992516_1.docx